30024. McELREATH *v.* CITY OF ROME.

Decided April 8, 1943. Rehearing denied May 12, 1943.

*James Maddox,* for plaintiff in error. *Chastine Parker,* contra.

Sutton, J. Tom McElreath, a policeman of the City of Rome, Georgia, was served with the following notice by the chief of police of the city: "You are hereby notified that you have been suspended from the Rome police department because of your conduct in connection with breaking in the Joe Miller Grill. A hearing will be had on April 20, 1942, before the Civil Service Board of the City of Rome at the city auditorium in the recorder's court room at 10 o'clock a. m. This hearing will determine whether or not you are guilty of the charges and also whether your conduct as a policeman of said city has been unbecoming as a policeman, whether or not you will be discharged. This 13th day of April, 1942." A trial was had before the Civil Service Board on April 22, 1942, having been continued by agreement to that date, and the finding of the board was as follows: "After hearing all the evidence presented to the board and after hearing the statement of Tom McElreath and after hearing argument of counsel, the unanimous decision of the board was that the charges against Tom McElreath was sustained by the evidence. That his conduct in con-

nection with the investigation of the breaking in the Joe Miller Grill was contrary to and a violation of the rules and instructions governing the police department. That such conduct as a policeman of the said city was unbecoming to an officer and was such as to bring discredit to any officer." The board recommended the discharge of McElreath.

No objection is raised as to the legality of the proceeding, but the case comes to this court by bill of exceptions assigning error on the judgment of the superior court in overruling a certiorari in which the defendant assigned error on the finding and judgment of the Civil Service Board on the usual general grounds and on the further ground that the finding that "his conduct in connection with the investigation of the breaking in the Joe Miller Grill was contrary to and a violation of the rules and regulations governing the police department" is contrary to law and without any evidence to support it; that there was no rule or regulation governing the police department promulgated by the Civil Service Board or the police department as to how or in what way a police officer should investigate a breaking or an alleged breaking, or how such a police officer should conduct himself in making such an investigation; that there is no evidence whatever showing any official misconduct on the part of petitioner in making said investigation, and that he was not so charged in the written notice served on him and he was not being tried for any misconduct in reference to the investigation of the breaking in the Joe Miller Grill, but he was charged with misconduct in connection with breaking in the Joe Miller Grill, and that all of the evidence had reference to that charge; that such a finding was not relative or pertinent to the charge made, and could not be the basis of a judgment discharging him from the Rome police department, and that the finding that "such conduct as a policeman of the said city was unbecoming to an officer and was such as to bring discredit to any officer involved" is contrary to law and to the evidence and without any evidence to support it.

It was alleged in the petition for certiorari, and admitted in the answer of the members of the Civil Service Board, that "In accordance with the provisions of the act of the legislature creating said Civil Service Board the said board did promulgate the following rule: 'Any policeman who shall be found at any disreputable

place while on or off duty (except in discharge of official duty) or found conducting himself in any manner unbecoming a gentleman and officer shall be dealt with by the commission at their discretion," and that said rule was in full force and effect at the time complained, and that there was no other or further rule or regulation relating to the charge set forth in the notice of said Civil Service Board. The evidence upon the trial of the case was substantially as follows: McElreath and another policeman, one Robertson, were policemen of the City of Rome with adjoining beats, and at times worked together at night in making investigations as to the security of places of business within their beats. On the night of the occasion out of which the case against McElreath arose he and Robertson went through an alley to a courtyard between certain buildings which may be understood from the following brief description: Along the west side of Broad Street in the City of Rome, between Third Avenue and Fourth Avenue, are a number of stores. On East First Street west of and paralleling Broad Street, and on the east side thereof, between Third Avenue and Fourth Avenue, certain property abuts. On the southeast corner of such street and Fourth Avenue there is post-office property, north of which is an alley running eastwardly from this street to a courtyard back of certain stores facing Broad Street. North of the alley is certain property, beyond which another alley runs eastwardly into the same courtyard into which the alley first named runs, and which second alley runs along the rear of a hotel which fronts on Third Avenue. One traveling along this alley eastwardly would come to the rear of a store known as Vassiere's which fronts on Broad Street, next to which, and southwardly from such store, is a store known as the Joe Miller Grill, and next to the latter named store is property occupied by Economy Auto Company, and next to that place of business is the Gordon Theater.

On the occasion when McElreath was relieved of duty, at about 2:30 to 3 o'clock in the morning, one Quarles, the night chief of police, together with other officers, drove a scout car about their routine work through the alley next to the post office into the courtyard above described. Quarles testified that the car was driven to about the rear of the Joe Miller Grill, and that he saw McElreath standing near this place, about four feet away from a hole or cellar way at the rear of Vassiere's. He asked McElreath where

Robertson was and McElreath replied that he was in the hotel. Quarles went to the hotel and was informed that Robertson was not there and had not been there all night. When Quarles returned to the automobile he asked where McElreath had gone and was informed that he had gone in the direction of East First Street. Quarles then told the other officers to drive the car away, which they did, and he waited in the darkness, and in a few minutes he saw Robertson come out of a hole or cellarway at the rear of Vassiere's, and which had been covered by a grill or ventilator but which had been removed. He threw his flashlight on Robertson and said to him: "George, I'm surprised at you;" to which Robertson replied, "Captain, can't you let me off this time?" Quarles said "No, George, I can't," and Robertson said, "We just pulled one too many." Robertson was not searched but was suspended by Quarles. No investigation was made at the time to determine whether any store had been entered, but the next morning Joe Miller reported the loss of money from his cash drawer in the approximate sum of $30. After seeing Robertson come out of the hole or cellarway which led into Vassiere's, and having taken him in charge, Quarles went around to the front of the Joe Miller Grill and found McElreath standing on Broad Street in front of the Joe Miller Grill and also suspended him. The testimony showed that a trap door in the floor of the Joe Miller Grill was open, and there were signs of footprints in the basement, and that from underneath the Vassiere place an underground passage led into the basement of the Joe Miller Grill. There was also testimony that since the night of the robbery a waiter named Gannon had not reported for work at the Joe Miller Grill, but the evidence showed that he was not due any wages, having drawn all due him until the time of his disappearance, and that he had written one of the employees that he was in Gadsden, Alabama. This latter employee testified that about two and a half weeks previously to the robbery he had showed Robertson how an entrance might be effected into the Joe Miller Grill by one using the underground passage from Vassiere's. The testimony showed that it was a part of the duty of McElreath and Robertson to patrol the alleys and courtyard above mentioned and to test the back doors of the places of business periodically throughout the night, and that it was not unusual for an officer to go to the hotel to use the toilet.

Robertson and McElreath testified that they met on their beats and together went from Broad Street to East First Street to test back doors and the courtyard and alleys; that they threw a flashlight on the car of Captain Quarles when it passed them on East First Street, and that they then turned into the driveway back of the post office and walked in the direction of the courtyard; that when they reached it Robertson told McElreath he had to go to the hotel, whereupon he turned to his left in the direction of the back door of the hotel, McElreath turning to his right to make his usual routine inspection and test the doors, and then proceeding towards the hotel and was about the alleyway when the police car came up. McElreath testified that, believing what Robertson had said to him, he told Quarles that Robertson had gone in the hotel, and that he then went on about his business, going first to East First Street and then to Broad Street, and after making certain inspections recrossing Broad Street, stopping in front of the Gordon Theater where he talked to several people, glanced at a newspaper which he purchased, and then walked to the front of the Joe Miller Grill where he met Quarles. Robertson corroborated McElreath as to the statement that he was going to the hotel, but that he was shining his flashlight towards the back doors of the buildings and just before he reached the hotel he noticed the covering or ventilator of the cellarway or opening at the rear of Vassiere's was up and he went to it to investigate, took off his overcoat and laid it down, and then went into the hole to see if any one was there and was in the basement for a short while, and finding no one there came out and was confronted by Quarles. As to the overcoat which Robertson testified he removed before entering the hole, Quarles testified that it was hidden 57 steps away from the entrance to the basement of Vassiere's, having been placed in one box on top of which was another box. Robertson testified that he did not enter the basement of the Joe Miller Grill, and that when he started to the hotel McElreath had turned to the right and away from him, going in the direction of the Gordon Theater, and that when he next saw McElreath he was on Broad Street in front of the Joe Miller Grill. There was testimony to the effect that when McElreath left the courtyard he did not go at once to the front of the Joe Miller Grill, but first went across Broad Street and then later was seen walking along that street before he was found by

Quarles in front of the Joe Miller Grill. There was testimony that the usual way for an officer to handle a situation where a place was found open was for him to summon some one from the chief's office for the purpose of accompanying him in an inspection of the premises, this being done to protect such an officer against any suspicion of improper conduct. Several witnesses testified as to the good character of McElreath.

By the act of 1937 (Ga. L. Ex. Sess. 1937-38, p. 1327) the charter of the City of Rome was amended by placing "all officers and members of the . . police departments" under civil service regulations under the direction and supervision of a Board of Civil Service created by such act, such officers and members to continue in their respective employment "during good behavior, efficiency, and obedience to such reasonable rules and regulations as may from time to time be prescribed by said Civil Service Board as hereinafter provided." Section 3 of the act provided for the appointment of such board by the Rome City Commission and section 5 provided that "The Civil Service Board shall make rules and regulations to carry out the purpose of this act, and for examinations, appointments and removals in accordance with its provisions, and the board may, from time to time, make changes in such rules." Section 9 provided that no member of the police department shall be removed or discharged except for cause upon written charges or complaint and after an opportunity to be heard, for notice and hearing, decision in writing by the board, right to counsel, etc Section 22 provided for the promulgation of rules and regulations by the board for the government of the police department in accordance with the provisions of the act. By the act of 1941 (Ga. L. 1941, p. 1690), the charter of the City of Rome was amended by providing that "In case of suspension or discharge of the accused by the board, the accused shall have the right of certiorari to the superior court of Floyd County as is provided by the laws of Georgia." It is admitted that in pursuance of authority vested in it the Civil Service Board promulgated the following rule: "Any policeman who shall be found . . conducting himself in any manner unbecoming a gentleman and officer shall be dealt with by the commission at their discretion." It is not contended by the plaintiff in error that the proceedings under which he was tried were not regular and legal, but it is urged that he was not found

guilty of the charge made against him, and that he was discharged under a finding of the board which can not be upheld, the plaintiff in error contending that he was charged and tried for conduct "in connection with breaking in the Joe Miller Grill" but was found guilty of misconduct "in connection with the *investigation* of the breaking in the Joe Miller Grill," and that the evidence did not show that he made any investigation. (Italics ours.)

The conclusions drawn by the plaintiff in error can not be sustained. The charge and trial were not limited as is contended. McElreath was served with a notice which substantially and sufficiently informed him that he would be tried, not only on the charge mentioned by the plaintiff in error, but also "whether your conduct as a policeman of said city has been unbecoming as a policeman." A trial upon such charge was authorized under the rule made by the Civil Service Board that "Any policeman . . found conducting himself in any manner unbecoming a gentleman and officer shall be dealt with by the commission at their discretion," subject to the right of the accused to the writ of certiorari. The finding of the board was not only as to McElreath's conduct "in connection with the *investigation* of the breaking in the Joe Miller Grill" (italics ours), but "the unanimous decision of the board was that the charges against Tom McElreath were sustained by the evidence." This necessarily includes the charge as to conduct unbecoming a policeman. The finding is not expressed in such language as should have been used by an accurate and painstaking lawyer, but being in effect a verdict should be treated in the same way as the law deals with an ordinary verdict. As held in *Tibbs* v. *Atlanta,* 125 *Ga.* 18 (5) (53 S. E. 811): "The result of a trial before such a board, as expressed in its findings, like a verdict in an ordinary case, is to have a reasonable intendment, and a reasonable construction, and is not to be set aside except for necessity." If the evidence was sufficient to authorize it, the result is sustainable as a finding that McElreath was guilty of conduct unbecoming a policeman, even though technically it could not be sustained as a finding of misconduct in connection with the *investigation* of the breaking in the Joe Miller Grill.

The only question now to be determined, therefore, is whether or not the evidence authorized a finding that the accused's conduct under the circumstances testified to by the witness, Captain

Quarles, was unbecoming a policeman. McElreath's guilt or innocence may properly be considered by an examination of the conduct of Robertson with whom he was associated on the night of the robbery. An employee of the Joe Miller Grill testified that about two and a half weeks previously he had shown Robertson how an entrance might be effected into the Grill by one coming through a trap door in the floor from a basement or underground passage between Vassiere's and the Grill. This witness pointed out this access because, as he testified, he feared some robbery might occur and he did not want to be under suspicion. Robertson was found by Captain Quarles emerging from the hole that led into the basement of Vassiere's. In entering this hole he had removed his overcoat, but had not placed it where it might readily be seen, but it was hidden, according to the testimony of Captain Quarles, 57 steps away in a box on top of which was another box. When confronted by Quarles with the statement, "I'm surprised at you," Robertson replied, "Can't you let me off this time?" and "We just pulled one too many." Certainly such evidence would authorize the board to find that Robertson was the one who committed the burglary of the Joe Miller Grill. Proof of guilt is not required to a mathematical certainty, but only to a moral and reasonable certainty and beyond a reasonable doubt. Did McElreath know of the criminal act or intention of Robertson, and if so, was his conduct unbecoming that of a policeman? The evidence shows that he had accompanied Robertson to the courtyard in the rear of the buildings on the West side of Broad Street. He was found by Captain Quarles at a time when Robertson had entered the hole at the rear of Vassiere's and was *standing* only four feet away. When he was asked about Robertson he stated that he had gone to the hotel the back of which abuts on the courtyard. Robertson corroborated McElreath's statement that he had been told by Robertson that he was going to the hotel, but the board was authorized to disbelieve him, and to have concluded that because McElreath was found standing only four feet away from the hole into which his partner had entered he was acting as a lookout; that by informing Quarles that Robertson had gone to the hotel he sought to conceal his real whereabouts and criminal mission, and that he abandoned his enterprise, leaving Robertson to his own devices, only because he had become aware that his superior officer was in the immediate

vicinity. It is significant, too, that when Quarles found him in front of the Joe Miller Grill and informed him that he was suspended he showed no interest in asking the reason for it. If McElreath was really cognizant of Robertson's criminal purpose, and was acting as a lookout, all of which the board was authorized to find from the evidence, no argument is necessary to demonstrate that his conduct was at least unbecoming a policeman and detrimental to the welfare of the city. The evidence authorized the finding as charged in that respect, and the superior court did not err in overruling the certiorari.

Judgment affirmed. Stephens, P. J., concurs. Felton, J., dissents.